## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLEDISTRICT OF FLORIDA
## TAMPA DIVISION

MELISSA BARON, OLIVIA ENLOE, MARCO LERRA, and JOHN PELS,

on behalf of themselves and all others similarly situated,

        Plaintiffs,

vs.

SYNIVERSE CORPORATION,

        Defendant.

Case No.: _____

**CLASS ACTION COMPLAINT**

DEMAND FOR JURY TRIAL

Plaintiffs Melissa Baron, Olivia Enloe, Marco Lerra, and John Pels ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), bring this Class Action Complaint against Syniverse Corporation ("Syniverse" or "Defendant"), and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

### I. INTRODUCTION

1. Plaintiffs bring this Class Action against Defendant for its failure to properly secure and safeguard private and personally identifiable information that Defendant stored on and/or processed through its Electronic Data Transfer (EDT) environment, including, without limitation, call records and message data, such as call length and cost, caller and receiver's numbers, the location of the parties in the call, as well as the actual content of SMS text messages (collectively, "personally identifiable information" or "PII").[1]

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or

2.      According to the company's website, Syniverse processes 740 billion texts every year.[2]

3.      In previous press releases, Syniverse has described itself as a company that "fuels mobile communications for nearly every person and device in the world."[3]  Syniverse is a critical part of the global telecommunications infrastructure used by AT&T, T-Mobile, Verizon and several others around the world.

4.      Syniverse explicitly promises security for its customers and their users' data. According to its website,[4] Syniverse provides:

> ***Unparalleled protection for your mobile connectivity. Security is at our core. That's why we built a global network to bypass threats from the public internet. So you can trust that your customers and your business are protected when they're connected.***
>
> Securely connect and protect devices anywhere on Earth.
>
> Our suite of mobile security solutions provide secure connectivity with the reach of mobile, the flexibility of software-defined networks, and the security of a private network.
>
> That empowers you to offer customers wireless and cloud connectivity access for enterprise and IoT applications. And it's all backed by our extensive knowledge and expertise in the next evolution of network security.

5.      On September 27, 2021, however, Syniverse, through M3-Brigade Acquisition II

---

identifying information. 2 CFR § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on their face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security number, passport number, driver's license number, financial account number).

[2] https://www.syniverse.com/products/operator-messaging
[3] https://www.syniverse.com/news-and-events/syniverse-merger-with-m3-brigade-acquisition-ii-corp
[4] https://www.syniverse.com/product-categories/mobile-security (emphasis added)

Corp. ("M3 Brigade"), informed the Securities and Exchange Commission ("SEC") that an unauthorized actor had exploited a vulnerability in Syniverse's systems (the "Data Breach").

6.      Syniverse revealed that, during the Data Breach, the unauthorized actor had access to Syniverse's systems beginning in May 2016, but the company did not discover the breach until May 2021.

7.      And even though Syniverse knew of the Data Breach since May 2021, it only chose to inform the public six months later as it prepared to go public again via a merger with M3-Brigade, a special purpose acquisition company.  The transaction implies an initial enterprise value for Syniverse of $2.85 billion.

8.      By obtaining, collecting, processing, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties to those individuals, including the duty to protect and safeguard their PII.

9.      The exposed PII of Plaintiffs and Class Members can be sold on the dark web and subjects the Plaintiffs to imminent and unreasonable harm. Hackers can access and then offer for sale the unencrypted, unredacted PII to criminals.  Plaintiffs and Class Members face a lifetime risk of identity theft, black mail, or other harm, which is heightened here by the loss of sensitive text message data that may also contain financial account or other sensitive information.

10.      This PII was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect the PII of Plaintiffs and Class Members.

11.      Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of its inadequate information security practices; and (iii) avoid sharing the PII of Plaintiffs and Class Members without adequate safeguards.  Defendant's

conduct was tortious and violates the common law as well as various federal and state statutes.

12.     Plaintiffs and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, and significantly (iv) the continued and increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII. Plaintiffs have also suffered nominal damages.

13.     Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiffs' and Class Members' PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II. PARTIES

14.     Plaintiff Melissa Baron is a resident and citizen of Madera, California, and during the times relevant to this Complaint has been a cellular phone customer of T-Mobile.

15.     Plaintiff Olivia Enloe is a resident and citizen of Reynoldsburg, Ohio, and during the times relevant to this Complaint has been a cellular phone customer of Verizon and sent and received text messages.

16.     Plaintiff Marco Lerra is a resident and citizen of St. Petersburg, Florida, and during the times relevant to this Complaint has been a cellular phone customer of T-Mobile and Verizon and sent and received text messages.

17.     Plaintiff John Pels is a resident and citizen of Windsor, California, and during the times relevant to this Complaint has been a cellular phone customer of AT&T and sent and received text messages.

18.     Defendant Syniverse Corporation is a Delaware corporation, headquartered at in Tampa, Florida.

19.     All of Plaintiffs' claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

### III. JURISDICTION AND VENUE

20.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one other Class Member is a citizen of a state different from Defendant to establish minimal diversity.

21.     The Middle District of Florida has personal jurisdiction over Defendant because Defendant is headquartered in this District and Defendant conducts substantial business in Florida and this District through its headquarters, offices, parents, and affiliates.

22.     Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant and/or

its parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

***As a Sophisticated Service Provider, Syniverse Knew the Risk that Cybercriminals Posed to its Data***

23.     Syniverse is a Delaware corporation, with its headquarters located in Florida, that was originally founded as a GTE business unit in 1987 under the name "GTE Telecommunication Services Inc."

24.     After several corporate metamorphoses, including periods of corporate ownership, public company operation, and name changes, Syniverse became a private corporation again after being acquired by an affiliate of The Carlyle Group for approximately $2.6 billion in 2011.

25.     Syniverse advertises itself as "The world's most connected company™."[5]

26.     Syniverse provides "unified, mission-critical platforms enabling seamless interoperability across the mobile ecosystem" for two distinct groups of customers: telecommunications carriers, and enterprises."[6]

27.     Syniverse's carrier customers consist of mobile network operators, mobile virtual network operators, multiple-system operators, and other communications service providers, and include some of the biggest global telecommunications carriers in the world, including AT&T, T-Mobile, Verizon, Vodafone, China Mobile, and others.

28.     Syniverse's enterprise customers primarily consist of enterprises across multiple industry verticals, OTTs, social media companies and technology platform companies.

---

[5] https://www.syniverse.com/news-and-events/syniverse-merger-with-m3-brigade-acquisition-ii-corp
[6] *Id.*

29.     Syniverse describes itself as a trusted neutral intermediary to approximately 800 carrier customers and 450 enterprises and technology providers.  In a conference call about the proposed M3 Brigade acquisition of Syniverse, Defendant's CEO, Andrew Davies, described Syniverse as follows:

> In a nutshell, Syniverse may be the most important company you've never heard of. We have had two tag lines being, we make mobile work and we're the world's most connected company. We are the trusted neutral intermediary and central nervous system that keeps devices, data traffic and messages flowing seamlessly and securely across the globe.
>
> If you've ever sent a message to someone with another carrier, that's Syniverse. If you've travelled overseas and made a phone call there, that's also Syniverse. If you've received a text message with any of a two-factor authentication code, an airport gate change notification, or a delivery reschedule, that's Syniverse too. Those are just a few simple illustrative examples of how we enable and drive the evolution of the entire communications ecosystem.
>
> We power the connected world and the digital economy by connecting over 8 billion devices to the mobile ecosystem allowing them to roam the globe seamlessly and securely. By connecting these 8 billion mobile devices we move nearly 3.5 exabits of data annually over our IPX network, the largest private IP network on the planet. For context that volume of data is more than 10,000 times the data stored in the entire library of Congress and it gives us a substantial share of global IPX market.[7]

30.     Syniverse boasts providing "**_secure_**, global connectivity" that is the "foundation for the future of all IP-based services," and advertises "a future-proof network architecture for mobile communications providers to reduce cost, establish security and provide an optimal user experience." (emphasis added).[8]

31.     Syniverse serves nearly every mobile network operator in the world and its

---

[7] https://www.m3-brigade.com/sec-filings/content/0001193125-21-249348/d186797ddefa14a.htm
[8] https://www.syniverse.com/products/ipx-network

solutions help carriers provide their customers with secure global connectivity and messaging. Syniverse's carrier product groups consist of Global Network Services, Outsourced Carrier Solutions, and Messaging Solutions.

32.   According to an investor presentation, Syniverse powers the digital economy for over 8 billion devices:



**…And Powers the Digital Economy for Over 8 Billion Devices**

*Syniverse recognizes the importance of data security and reveals the Data Breach*

33.   On September 27, 2021, in preparation for its merger with M3-Brigade, Syniverse reported to the SEC:

> Syniverse has experienced, and may in the future face, hackers, cybercriminals or others gaining unauthorized access to, or otherwise misusing, its systems to misappropriate its proprietary information and technology, interrupt its business, and/or gain unauthorized access to its or its customers' confidential information.

For example, in May 2021, Syniverse became aware of unauthorized access to its operational and information technology systems by an unknown individual or organization (the "May 2021 Incident"). Promptly upon Syniverse's detection of the unauthorized access, Syniverse launched an internal investigation, notified law enforcement, commenced remedial actions and engaged the services of specialized legal counsel and other incident response professionals. Syniverse has conducted a thorough investigation of the incident.

The results of the investigation revealed that the unauthorized access began in May 2016. Syniverse's investigation revealed that the individual or organization gained unauthorized access to databases within its network on several occasions, and that login information allowing access to or from its Electronic Data Transfer ("EDT") environment was compromised for approximately 235 of its customers. All EDT customers have been notified and have had their credentials reset or inactivated, even if their credentials were not impacted by the incident. All customers whose credentials were impacted have been notified of that circumstance.

Syniverse has notified all affected customers of this unauthorized access where contractually required, and Syniverse has concluded that no additional action, including any customer notification, is required at this time.[9]

### *Defendant Acquires, Collects and Stores Plaintiffs' and Class Members' PII.*

34.      Plaintiffs' and Class Members' unencrypted information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members.  Unauthorized individuals can easily access the PII of Plaintiffs and Class Members.

35.      Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiffs and Class Members, causing their PII to be exposed.

---

[9] https://www.sec.gov/Archives/edgar/data/1839175/000119312521284329/d234831dprem14a.htm

36.     As a condition of providing services to its customers, Defendant requires that its customers entrust Defendant with highly confidential PII of their users, including Plaintiffs and Class Members.

37.     At all times relevant to this Complaint, Plaintiffs and Class Members were customers of Defendant's customers who (i) entrusted their highly confidential PII (including Social Security numbers) to cell phone providers who, in turn, entrusted that material to Defendant and (ii) later learned that their PII was compromised in the Data Breach.

38.     By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

39.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### Securing PII and Preventing Breaches

40.     Defendant could have prevented this Data Breach by properly securing and encrypting the PII of Plaintiffs and Class Members.

41.     Defendant's negligence in safeguarding the PII of Plaintiffs and Class Members is bewildering given the repeated warnings and alerts about the need to protect and secure sensitive data.

42.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members.

10

43.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[10] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[11]

44.     The ramifications of Defendant's failure to keep secure the PII of Plaintiffs and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

### *Value of Personal Identifiable Information*

45.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.  For example, one source reports that personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[12] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[13] Criminals can

---

[10] 17 C.F.R. § 248.201 (2013).

[11] *Id.*

[12] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*:  https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed June 9, 2021).

[13] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*:  https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/  (last accessed June 9, 2021).

also purchase access to entire company data breaches from $900 to $4,500.[14]

46.     The information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change as text messages may include things like name, Social Security number, and date of birth.

47.     This data demands a much higher price on the black market. According to Martin Walter, senior director at cybersecurity firm RedSeal, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[15]

48.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

49.     The PII of Plaintiffs and Class Members was taken by hackers to engage in identity theft or to sell it to other criminals who will purchase the PII for that purpose.  The fraudulent activity resulting from the Data Breach may not come to light for years.

50.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data
> may be held for up to a year or more before being used to commit

---

[14] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed June 9, 2021).

[15] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed June 9, 2021).

> identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[16]

51.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members and of the foreseeable consequences that would occur if the PII was compromised, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members a result.

52.     Plaintiffs and Class Members now face years of constant monitoring of their financial and personal records and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

53.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its EDT environment.

54.     To date, Defendant has never even notified impacted customers of this breach and refuses to do so.

55.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

## V. CLASS ALLEGATIONS

56.     Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

---

[16]  *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/products/gao-07-737 (last accessed June 9, 2021).

57.     The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States whose PII was accessed during the security incident referenced in the Data Breach that Defendant revealed to the SEC on September 27, 2021.

58.     The Florida Subclass that Plaintiff Lerra seeks to represent is defined as follows:

> All individuals residing in Florida whose PII was accessed during the security incident referenced in Data Breach that Defendant revealed to the SEC on September 27, 2021 (the "Florida Subclass").

59.     The California Subclass that Plaintiffs Baron and Pels seek to represent is defined as follows:

> All individuals residing in California whose PII was accessed during the security incident referenced in Data Breach that Defendant revealed to the SEC on September 27, 2021 (the "Florida Subclass").

60.     Excluded from the Classes and Subclasses are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

61.     Plaintiffs reserve the right to modify or amend the definition of the proposed classes and subclasses before the Court determines whether certification is appropriate.

62.     Numerosity, Fed R. Civ. P. 23(a)(1): The Nationwide Class and Subclasses are so numerous that joinder of all members is impracticable. Millions of class members were likely impacted.

14

63.   <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Class and Subclasses exist and predominate over any questions affecting only individual Class Members. These include:

a.   Whether and to what extent Defendant had a duty to protect the PII of Plaintiffs and Class Members;

b.   Whether Defendant had a duty not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

c.   Whether Defendant had a duty not to use the PII of Plaintiffs and Class Members for non-business purposes;

d.   Whether Defendant failed to adequately safeguard the PII of Plaintiffs and Class Members;

e.   Whether and when Defendant actually learned of the Data Breach;

f.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

g.   Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiffs and Class Members;

i.   Whether Plaintiffs and Class Members are entitled to actual, consequential, statutory, and/or nominal damages as a result of Defendant's wrongful conduct;

j.   Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

k.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

64.  <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendant's misfeasance.

65.  <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

66.  <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

67.  <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their

16

common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

68.     The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

69.     The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

70.     Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

71.     Unless a Class-wide injunction is issued, Defendant may continue in its failure to

17

properly secure the PII of Class Members and may continue to act unlawfully as set forth in this Complaint.

72.     Further, Defendant has acted or refused to act on grounds generally applicable to the and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

73.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.   Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

b.   Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

c.   Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d.   Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

e.   Whether Defendant breached the implied contract;

f.   Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

18

h.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiffs and Class Members; and,

i.   Whether Plaintiffs and Class Members are entitled to actual, consequential, statutory, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

### COUNT I
### Negligence
### (On Behalf of Plaintiffs and the Nationwide Class)

74.   Plaintiffs and the Nationwide Class re-allege and incorporate by reference paragraphs 1 to 73 as if fully set forth herein.

75.   As a condition of being customers of cell phone providers, Plaintiffs utilized call and text message services that detailed sensitive information and PII.

76.   Cell phone providers entrusted their customers' PII to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

77.   Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Nationwide Class could and would suffer if the PII were wrongfully disclosed.

78.   Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Nationwide Class involved an unreasonable risk of harm to Plaintiffs and the Nationwide Class, even if the harm occurred through the criminal acts of a third party.

79.   Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to

unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that the PII of Plaintiffs and the Nationwide Class in Defendant's possession was adequately secured and protected.

80.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII it was no longer required to retain pursuant to regulations.

81.    Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of the PII of Plaintiffs and the Nationwide Class.

82.    Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and the Nationwide Class.  That special relationship arose because Plaintiffs and the Nationwide Class entrusted Defendant with their confidential PII, a necessary part of being customers of Defendant's customers.

83.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Nationwide Class.

84.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Nationwide Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

85.    Plaintiffs and the Nationwide Class were the foreseeable and probable victims of any inadequate security practices and procedures.  Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Nationwide Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

86.    Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and the Nationwide Class. Defendant's misconduct included, but was not limited to, its failure to take the

steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of the PII of Plaintiffs and the Nationwide Class, including basic encryption techniques freely available to Defendant.

87.   Plaintiffs and the Nationwide Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

88.   Defendant was in a position to protect against the harm suffered by Plaintiffs and the Nationwide Class as a result of the Data Breach.

89.   Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiffs and the Nationwide Class.

90.   Defendant has admitted that the PII of Plaintiffs and the Nationwide Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

91.   Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and the Nationwide Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiffs and the Nationwide Class during the time the PII was within Defendant's possession or control.

92.   Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Nationwide Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

93.   Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the PII of Plaintiffs and the Nationwide Class in the face of increased risk of theft.

94.   Defendant, through its actions and/or omissions, unlawfully breached its duty to

Plaintiffs and the Nationwide Class by failing to have appropriate procedures in place to detect and prevent dissemination of its current and former customers' PII.

95.     Defendant breached its duty to exercise appropriate clearinghouse practices by failing to remove former customers' PII it was no longer required to retain pursuant to regulations.

96.     But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Nationwide Class, the PII of Plaintiffs and the Nationwide Class would not have been compromised.

97.     Plaintiffs injuries were proximately caused by Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Nationwide Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Nationwide Class.  The PII of Plaintiffs and the Nationwide Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

98.     Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC's periodic publications and orders form part of the basis of Defendant's duty in this regard.

99.     Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Nationwide Class.

100.     Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

101.    Plaintiffs and the Nationwide Class are within the class of persons that the FTC Act were intended to protect.

102.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Nationwide Class.

103.    As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of Plaintiffs and the Nationwide Class; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Nationwide Class.

104.    As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class have suffered and will continue to suffer other forms of injury

and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

105.    Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

106.    As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

<u>COUNT II</u>
**THIRD-PARTY BENEFICIARY OF CONTRACTS**
**(On Behalf of Plaintiffs and the Nationwide Class)**

107.    Plaintiffs and the Nationwide Class, repeat and reallege paragraphs 1 through 73 as if fully restated herein.

108.    Defendant entered into legal contracts with its cellular provider and wireless carrier customers to provide services essential to Plaintiffs and the Nationwide Class  regarding the use of their text messaging services. Those contracts cannot be attached to this pleading because they are within the possession of Defendant and are protected by confidentiality and/or a protected trade secret.

109.    Plaintiffs and the Nationwide Class were intended third-party beneficiaries of such contracts.

110.    Defendant breached such contracts through the negligent, careless, reckless, and/or wrongful conduct described herein.

111.    Such breaches, namely, not safely storing and monitoring Plaintiffs and the Nationwide Class' PII, was a direct and proximate cause of damages suffered by Plaintiffs and the Nationwide Class

112.    As a direct and proximate result of Defendant's breach of contract, Plaintiffs and the Nationwide Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of Plaintiffs and the Nationwide Class; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Nationwide Class.

113.    As a direct and proximate result of Defendant's breach of contract, Plaintiffs and the Nationwide Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

114.    Additionally, as a direct and proximate result of Defendant's breach of contract,

Plaintiffs and the Nationwide Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

115.    As a direct and proximate result of Defendant's breach of contract, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

**COUNT III**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Nationwide Class)**

116.    Plaintiffs and the Nationwide Class re-allege and incorporate by reference paragraphs 1 to 73 as if fully set forth herein.

117.    Plaintiffs and the Nationwide Class had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

118.    Defendant owed a duty to its customers' customers, including Plaintiffs and the Nationwide Class, to keep their PII contained as a part thereof, confidential.

119.    Defendant failed to protect and released to unknown and unauthorized third parties the PII of Plaintiffs and the Nationwide Class.

120.    Defendant allowed unauthorized and unknown third parties access to and examination of the PII of Plaintiffs and the Nationwide Class, by way of Defendant's failure to protect the PII.

121.    The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiffs and the Nationwide Class is highly offensive to a reasonable person.

122.    The unauthorized release to, custody of, and examination by unauthorized third

parties of the PII of Plaintiffs and the Nationwide Class is of no legitimate concern to the public.

123.    The intrusion was into a place or thing, which was private and is entitled to be private.  Plaintiffs and the Nationwide Class disclosed their PII to Defendant as part of the current and former customers' relationship with Defendant, but privately with an intention that the PII would be kept confidential and would be protected from unauthorized disclosure. Plaintiffs and the Nationwide Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

124.    The Data Breach at the hands of Defendant constitutes an intentional interference with Plaintiffs' and the Nationwide Class's interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

125.    Defendant acted with a knowing state of mind when it permitted the Data Breach to occur because it was with actual knowledge that its information security practices were inadequate and insufficient.

126.    Because Defendant acted with this knowing state of mind, it had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiffs and the Nationwide Class.

127.    As a proximate result of the above acts and omissions of Defendant, the PII of Plaintiffs and the Nationwide Class was disclosed to third parties without authorization, causing Plaintiffs and the Nationwide Class to suffer damages.

128.    Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Nationwide Class in that the PII maintained by Defendant can be viewed, distributed, and used by

unauthorized persons for years to come. Plaintiffs and the Nationwide Class have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and the Nationwide Class.

129.   As a direct and proximate result of Defendant's invasion of privacy, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

**COUNT IV**
**Breach of Confidence**
**(On Behalf of Plaintiffs and the Nationwide Class)**

130.   Plaintiffs and the Nationwide Class re-allege and incorporate by reference paragraphs 1 to 73 as if fully set forth herein.

131.   At all times during Plaintiffs' and the Nationwide Class's interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiffs' and the Nationwide Class's PII that Plaintiffs and the Nationwide Class provided to Defendant.

132.   As alleged herein and above, Defendant's relationship with Plaintiffs and the Nationwide Class was governed by terms and expectations that Plaintiffs' and the Nationwide Class's PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

133.   Plaintiffs and the Nationwide Class provided their PII to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the PII to be disseminated to any unauthorized third parties.

134.   Plaintiffs and the Nationwide Class also provided their PII to Defendant with the explicit and implicit understandings that Defendant would take precautions to protect that PII from unauthorized disclosure.

135.   Defendant voluntarily received in confidence the PII of Plaintiffs and the

28

Nationwide Class with the understanding that PII would not be disclosed or disseminated to the public or any unauthorized third parties.

136.    Due to Defendant's failure to prevent and avoid the Data Breach from occurring, the PII of Plaintiffs and the Nationwide Class was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and the Nationwide Class's confidence, and without their express permission.

137.    As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiffs and the Nationwide Class have suffered damages.

138.    But for Defendant's disclosure of Plaintiffs' and the Nationwide Class's PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties.  The Data Breach was the direct and legal cause of the theft of Plaintiffs' and the Nationwide Class's PII as well as the resulting damages.

139.    The injury and harm Plaintiffs and the Nationwide Class suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiffs' and the Nationwide Class's PII.  Defendant knew or should have known its methods of accepting and securing Plaintiffs' and the Nationwide Class's PII was inadequate as it relates to, at the very least, securing servers and other equipment containing Plaintiffs' and the Nationwide Class's PII.

140.    As a direct and proximate result of Defendant's breach of its confidence with Plaintiffs and the Nationwide Class, Plaintiffs and the Nationwide Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud,

and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of current and former customers; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Nationwide Class.

141.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and the Nationwide Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

142.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class)**

143.    Plaintiffs and the Nationwide Class re-allege and incorporate by reference paragraphs 1 to 73 as if fully set forth herein.

144.    Plaintiffs and the Nationwide Class conferred a monetary benefit on Defendant in the form of monies or fees paid for services from Defendant.  Defendant had knowledge of this benefit when it accepted the money from Plaintiffs and the Nationwide Class.

30

145.     The monies or fees paid by Plaintiffs and the Nationwide Class were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiffs and the Nationwide Class.

146.     Defendant failed to provide reasonable security, safeguards, and protections to the personal data of Plaintiffs and the Nationwide Class, which resulted in Plaintiffs and the Nationwide Class overpaying Defendant's customers for the services they purchased.

147.     Defendant failed to disclose to Plaintiffs and the Nationwide Class that its safeguards and security measures were inadequate to safeguard the PII of Plaintiffs and the Nationwide Class against theft.

148.     Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and the Nationwide Class because Defendant failed to provide adequate safeguards and security measures to protect the PII of Plaintiffs and the Nationwide Class, who paid for such measures but did not receive them.

149.     Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiffs and the Nationwide Class.

150.     Defendant's enrichment at the expense of Plaintiffs and the Nationwide Class is and was unjust.

151.     As a result of Defendant's wrongful conduct, as alleged above, Plaintiffs and the Nationwide Class are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

## COUNT VI
**Violation of the Florida Deceptive and Unfair Trade Practices Act,
(Fla. Stat. §§ 501.201, *et seq.*)
(On Behalf of Plaintiff Lerra and the Florida Subclass)**

152.     Plaintiff Lerra and the Florida Subclass re-allege and incorporate by reference

paragraphs 1 to 73 as if fully set forth herein.

153.    Defendant engaged in the conduct alleged in this Complaint through transactions in and involving trade and commerce.  Mainly, Defendant obtained the PII of Plaintiff Lerra and the Florida Subclass through advertising, soliciting, providing, offering, and/or distributing goods and services to Plaintiff Lerra and the Florida Subclass and the Data Breach occurred through the use of the internet, an instrumentality of interstate commerce.

154.    As alleged herein this Complaint, Defendant engaged in unfair or deceptive acts or practices in the conduct of consumer transactions, including, among other things, the following:

a.  failure to implement adequate data security practices to safeguard the PII of Plaintiff Lerra and the Florida Subclass;

b.  failure to make only authorized disclosures of the PII of Plaintiff Lerra and the Florida Subclass; and

c.  failure to disclose that its computer systems and data security practices were inadequate to safeguard the PII of Plaintiff Lerra and the Florida Subclass from theft; and

d.  failure to timely notify Plaintiff Lerra and the Florida Subclass of the Data Breach, as required by Fla. Stat. § 501.171(4)

155.    Defendant's actions constitute unconscionable, deceptive, or unfair acts or practices because, as alleged herein, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are and were substantially injurious to its current and former customers.

156.    In committing the acts alleged above, Defendant engaged in unconscionable, deceptive, and unfair acts and practices acts by omitting, failing to disclose, or inadequately

disclosing to its current and former customers that it did not follow industry best practices for the collection, use, and storage of the PII of Plaintiff Lerra and the Florida Subclass.

157.    As a direct and proximate result of Defendant's conduct, Plaintiff Lerra and the Florida Subclass have been harmed and have suffered damages including, but not limited to: damages arising from identity theft and fraud; out-of-pocket expenses associated with procuring identity protection and restoration services; increased risk of future identity theft and fraud, and the costs associated therewith; and time spent monitoring, addressing and correcting the current and future consequences of the Data Breach.

158.    As a direct and proximate result of the unconscionable, unfair, and deceptive acts or practices alleged herein, Plaintiff Lerra and the Florida Subclass have been damaged and are entitled to recover actual damages, an order providing declaratory and injunctive relief, and reasonable attorneys' fees and costs, to the extent permitted by law.

159.    Also as a direct result of Defendant's knowing violation of the Florida Unfair and Deceptive Trade Practices Act, Plaintiff Lerra and the Florida Subclass are entitled to damages as well as injunctive relief, including, but not limited to:

a.    Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b.    Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

c.      Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

d.      Ordering that Defendant segment PII by, among other things, creating firewalls and access controls so that if one area of Defendant is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.      Ordering that Defendant purge, delete, and destroy in a reasonably secure manner PII not necessary for its provisions of services;

f.      Ordering that Defendant conduct regular database scanning and securing checks;

g.      Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

h.      Ordering Defendant to meaningfully educate its current and former customers about the threats they face as a result of the loss of their PII to third parties, as well as the steps Defendant's current and former customers must take to protect themselves; and

i.      requiring Defendant to thoroughly and regularly evaluate any vendor's or third-party's technology that allows or could allow access to PII and to promptly migrate to superior or more secure alternatives.

## COUNT VII
**Violation of the California Consumer Privacy Act, Cal. Civ. Code §§ 1798.100, *et seq*.**
**(On Behalf of Plaintiffs Baron and Pels and the California Subclass)**

160.    Plaintiffs Baron and Pels and the California Subclass re-allege and incorporate by

reference paragraphs 1 to 73 as if fully set forth herein.

161.    Plaintiffs Baron and Pels and California Subclass members are residents of California.

162.    Syniverse is a corporation that is organized or operated for the profit or financial benefit of its shareholders or other owners, with a public offering valuation of approximately $2.85 billion.

163.    Syniverse is a business that collects consumers' personal information as defined by Cal. Civ. Code § 1798.140(e). Specifically, Syniverse obtains, receives, or accesses consumers' personal information when customers send text messages through infrastructure maintained by Syniverse.

164.    Syniverse and its direct customers determine the purposes and means of processing consumers' personal information. Syniverse uses consumers' personal data to provide services at customers' requests, as well as to develop, improve, and test Syniverse services.

165.    Syniverse is registered as a "data broker" in California, which is defined as a "business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct relationship." Cal. Civ. Code § 1798.99.80.

166.    Syniverse violated Section 1798.150 of the California Consumer Privacy Act by failing to prevent Plaintiffs Baron and Pels and the California Subclass members' nonencrypted and nonredacted personal information from unauthorized access and exfiltration, theft, or disclosure as a result of Syniverse's violation of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

167.    Syniverse knew or should have known that its data security practices were inadequate to secure California Subclass members' PII and that its inadequate data security

practices gave rise to the risk of a data breach.

168.    Syniverse failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the PII it collected and stored.

169.    The cybercriminals accessed "nonencrypted and unredacted personal information" as covered by Cal. Civ. Code § 1798.81.5(A)(1)(d), in the Data Breach.

170.    Upon information and belief, Plaintiffs Baron and Pels' and California Subclass members' PII accessed by the cybercriminals in the Data Breach includes "nonencrypted and unredacted personal information" as covered by Cal. Civ. Code § 1798.81.5(A)(1)(d).

171.    Plaintiffs Baron and Pels and California Subclass members seek injunctive relief in the form of an order requiring Syniverse to employ adequate security practices consistent with law and industry standards to protect the California Subclass members' PII, requiring Syniverse to complete its investigation, and to issue an amended statement giving a detailed explanation that confirms, with reasonable certainty, what categories of data were stolen and accessed without the California Subclass members' authorization, along with an explanation of how the data breach occurred.

172.    As a direct and proximate result of Syniverse's violations of the Cal. Civ. Code §§ 1798.150, Plaintiffs Baron and Pels and California Subclass members suffered damages, as described above.

173.    On October 5, 2021, counsel for Plaintiffs Baron and Pels served written notice identifying Syniverse's violations of Cal. Civil Code § 1798.150(a) and demanding the data breach be cured, pursuant to Cal. Civil Code § 1798.150(b).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court enter an Order:

A.  certifying the Nationwide Class, the Florida Subclass, and the California Subclass and appointing Plaintiffs and their Counsel to represent each such Class and Subclass;

B.  enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members;

C.  providing injunctive or other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

   i.  prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

   ii.  requiring Defendant to protect, including through encryption and other means, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

   iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

   iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

37

v. prohibiting Defendant from maintaining the PII of Plaintiffs and Class Members on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x. requiring Defendant to conduct regular database scanning and securing checks;

xi. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how

to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.   requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment; and

      xvii.   requiring Defendant to thoroughly and regularly evaluate any vendor's or third-party's technology that allows or could allow access to PII and to promptly migrate to superior or more secure alternatives;

D.      For an award of damages, including actual, consequential, statutory, and nominal damages, as allowed by law in an amount to be determined;

E.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.      For prejudgment and post-judgment interest on all amounts awarded; and,

G.      Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand that this matter be tried before a jury.


Date: October 5, 2021                Respectfully Submitted,

                                         */s/ John A. Yanchunis*

                                         John A. Yanchunis
Ryan D. Maxey
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505
jyanchunis@ForThePeople.com
**rmaxey@ForThePeople.com**

James J. Pizzirusso*
**HAUSFELD LLP**
888 16th Street, N.W.
Suite 300
Washington, DC 20006
(202) 540-7200
jpizzirusso@hausfeld.com

Steven M. Nathan*
**HAUSFELD LLP**
33 Whitehall Street

14th Floor
New York, New York 10004
(646) 357-1100
snathan@hausfeld.com

Amy E. Keller*
James A. Ulwick*
**DICELLO LEVITT GUTZLER**
Ten North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
(312) 214-7900
akeller@dicellolevitt.com
julwick@dicellolevitt.com

Marc R. Weintraub (Florida Bar No. 119976)
**Bailey Glasser LLP**
360 Central Avenue, Suite 1450
St. Petersburg, Florida 33701
T: 727.894.6745
F: 727.894.2649
mweintraub@baileyglasser.com

Michael L. Murphy*
Lawrence J. Lederer*
**Bailey Glasser LLP**
1055 Thomas Jefferson Street NW, Suite 540
Washington, DC 20007
T: 202.463.2101
F: 202.463.2103
mmurphy@baileyglasser.com
llederer@baileyglasser.com


*Pro Hac Vice to be submitted