**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLEDISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| MELISSA BARON, OLIVIA ENLOE, MARCO LERRA, JOHN PELS, ALEXIS MULLEN, NICHOLAS YEOMELAKIS, and THOMAS MACNISH, <br><br> on behalf of themselves and all others similarly situated, <br><br>       Plaintiffs, <br> vs. <br><br> SYNIVERSE CORPORATION, <br><br>       Defendant. | Case No.: 8:21-cv-02349-SCB-SPF <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

Plaintiffs Melissa Baron, Olivia Enloe, Marco Lerra, John Pels, Alexis Mullen, Nicholas Yeomelakis, and Thomas Macnish ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), bring this Consolidated Class Action Complaint against Syniverse Corporation ("Syniverse" or "Defendant"), and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

**I. INTRODUCTION**

1.     Plaintiffs bring this Class Action against Defendant for its failure to properly secure and safeguard private and personally identifiable information that

Defendant stored on and/or processed through its Electronic Data Transfer (EDT) environment, including, without limitation, call records and message data, such as call length and cost, caller and receiver's numbers, the location of the parties in the call, as well as the actual content of SMS text messages (collectively, "personally identifiable information" or "PII").[1]

2.     According to the company's website, Syniverse processes 740 billion texts every year.[2]

3.     For nearly two decades, wireless carriers in the US have used third parties like Syniverse to route text messages between networks. If an AT&T customer wants to send a message to another AT&T customer, AT&T can just move the message itself. But if an AT&T customer wants to send a message to a Sprint customer, a third-party company needs to take on the work of translating AT&T's message into Sprint's protocol, and physically routing it from one network to the other. The vast majority of that work is now done by Syniverse.

4.     Syniverse has described itself as a company that "fuels mobile

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 CFR § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on their face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security number, passport number, driver's license number, financial account number).

[2] https://www.syniverse.com/products/operator-messaging

communications for nearly every person and device in the world."[3]  Syniverse is a

critical part of the global telecommunications infrastructure used by AT&T, T-

Mobile, Verizon and other carriers around the world.

5.     Syniverse explicitly promises security for its customers and their users'

data.  According to its website,[4] Syniverse provides:

> ***Unparalleled protection for your mobile connectivity.
> Security is at our core. That's why we built a global
> network to bypass threats from the public internet. So
> you can trust that your customers and your business are
> protected when they're connected.***
>
> Securely connect and protect devices anywhere on Earth.
>
> Our suite of mobile security solutions provide secure
> connectivity with the reach of mobile, the flexibility of
> software-defined networks, and the security of a private
> network.
>
> That empowers you to offer customers wireless and cloud
> connectivity access for enterprise and IoT applications.
> And it's all backed by our extensive knowledge and
> expertise in the next evolution of network security.

6.     On September 27, 2021, however, Syniverse, through M3-Brigade

Acquisition II Corp. ("M3 Brigade"), informed the Securities and Exchange

Commission ("SEC") that an unauthorized actor had exploited a vulnerability in

Syniverse's systems (the "Data Breach").

---

[3] https://www.syniverse.com/news-and-events/syniverse-merger-with-m3-brigade-acquisition-ii-corp
[4] https://www.syniverse.com/product-categories/mobile-security (emphasis added)

7.     Syniverse revealed that, during the Data Breach, the unauthorized actor had access to Syniverse's systems beginning in May 2016, but the company did not discover the Data Breach until May 2021.

8.     Though Syniverse knew of the Data Breach since May 2021, it chose not to make this vital information public until six months later, and then only as part of its preparation for going public again through a merger with M3-Brigade, a special purpose acquisition company.  The transaction implies an initial enterprise value for Syniverse of $2.85 billion.

9.     By obtaining, collecting, processing, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties to those individuals, including the duty to protect and safeguard their PII.

10.    The exposed PII of Plaintiffs and Class Members can be accessed and/or sold on the dark web and subjects Plaintiffs and Class Members to imminent and unreasonable harm. Hackers can access and then offer for sale to criminals the unencrypted, unredacted PII of Plaintiffs and Class Members.  Plaintiffs and Class Members face a lifetime risk of identity theft, black mail, or other harm, which is heightened here by the loss of sensitive text message data that may also contain financial account or other sensitive information.

11.    This PII was compromised by Defendant's negligent and/or careless acts and omissions and its failure to protect the PII of Plaintiffs and Class Members.

4

12.     Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; (iii) timely inform Plaintiffs and Class Member of the Data Breach; and (iv) avoid sharing Plaintiffs and Class Members PII without adequate safeguards.  Defendant's conduct was tortious and violates the common law as well as various federal and state statutes.

13.     Plaintiffs and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) lost inherent market value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to, lost time, and significantly (iv) the continued and increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII. Plaintiffs have also suffered nominal damages.

14.     Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement

adequate and reasonable measures to ensure that Plaintiffs' and Class Members' PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, Plaintiffs and Class Members PII was compromised through disclosure to an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they are entitled to injunctive and other equitable relief.

## II. PARTIES

15.    Plaintiff Melissa Baron is a resident and citizen of Madera, California, and during the times relevant to this Complaint has been a cellular phone customer of T-Mobile.

16.    Plaintiff Olivia Enloe is a resident and citizen of Reynoldsburg, Ohio, and during the times relevant to this Complaint has been a cellular phone customer of Verizon and sent and received text messages.

17.    Plaintiff Marco Lerra is a resident and citizen of St. Petersburg, Florida, and during the times relevant to this Complaint has been a cellular phone customer of T-Mobile and Verizon and sent and received text messages.

18.     Plaintiff John Pels is a resident and citizen of Windsor, California, and during the times relevant to this Complaint has been a cellular phone customer of AT&T and sent and received text messages.

19.     Plaintiff Alexis Mullen is a citizen of Pennsylvania and resides in Philadelphia, Pennsylvania. During the period relevant to this Complaint has been a cellular phone customer of Verizon and sent and received text messages.

20.     Plaintiff Nicholas Yeomelakis is a citizen of Massachusetts, and resides in Charlestown, Massachusetts. During the period relevant to this Complaint has been a cellular phone customer of AT&T and sent and received text messages.

21.     Plaintiff Thomas Macnish is a citizen of Florida and resides in Pompano Beach, Florida. During the period relevant to this Complaint, has been a cellular phone customer of T-Mobile and sent and received text messages.

22.     Defendant Syniverse Corporation is a Delaware corporation, headquartered in Tampa, Florida.

23.     All of Plaintiffs' claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

### III. JURISDICTION AND VENUE

24.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs,

there are more than 100 members in the proposed class, and at least one other Class Member is a citizen of a state different from Defendant to establish minimal diversity.

25.     The Middle District of Florida has personal jurisdiction over Defendant because Defendant is headquartered in this District and Defendant conducts substantial business in Florida and this District through its headquarters, offices, parents, and affiliates.

26.     Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant and/or its parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

### *As a Sophisticated Service Provider, Syniverse Knew the Risk that Cybercriminals Posed to its Data*

27.     Syniverse is a Delaware corporation, with its headquarters located in Florida, that was originally founded as a GTE business unit in 1987 under the name "GTE Telecommunication Services Inc."

28.     After several corporate metamorphoses, Syniverse became a private corporation again after being acquired by an affiliate of The Carlyle Group for approximately $2.6 billion in 2011.

29.     Syniverse advertises itself as "The world's most connected company™."[5]

30.     Syniverse provides "unified, mission-critical platforms enabling seamless interoperability across the mobile ecosystem" for two distinct groups of customers: telecommunications carriers, and enterprises."[6]

31.     Syniverse's carrier customers consist of mobile network operators, mobile virtual network operators, multiple-system operators, and other communications service providers, and include some of the largest global telecommunications carriers in the world, including AT&T, T-Mobile, Verizon, Vodafone, China Mobile, and others.

32.     Syniverse's enterprise customers primarily consist of enterprises across multiple industry verticals, OTTs, social media companies and technology platform companies.

33.     Syniverse describes itself as a trusted neutral intermediary to approximately 800 carrier customers and 450 enterprises and technology providers. In a conference call about the proposed M3 Brigade acquisition of Syniverse, Defendant's CEO, Andrew Davies, described Syniverse as follows:

> In a nutshell, Syniverse may be the most important
> company you've never heard of. We have had two tag

---

[5] https://www.syniverse.com/news-and-events/syniverse-merger-with-m3-brigade-acquisition-ii-corp
[6] *Id.*

lines being, we make mobile work and we're the world's most connected company. We are the trusted neutral intermediary and central nervous system that keeps devices, data traffic and messages flowing seamlessly and securely across the globe.

If you've ever sent a message to someone with another carrier, that's Syniverse. If you've travelled overseas and made a phone call there, that's also Syniverse. If you've received a text message with any of a two-factor authentication code, an airport gate change notification, or a delivery reschedule, that's Syniverse too. Those are just a few simple illustrative examples of how we enable and drive the evolution of the entire communications ecosystem.

We power the connected world and the digital economy by connecting over 8 billion devices to the mobile ecosystem allowing them to roam the globe seamlessly and securely. By connecting these 8 billion mobile devices we move nearly 3.5 exabits of data annually over our IPX network, the largest private IP network on the planet. For context that volume of data is more than 10,000 times the data stored in the entire library of Congress and it gives us a substantial share of global IPX market.[7]

34.    Syniverse boasts providing "*secure*, global connectivity" that is the "foundation for the future of all IP-based services," and advertises "a future-proof network architecture for mobile communications providers to reduce cost, establish security and provide an optimal user experience." (emphasis added).[8]

35.    Syniverse serves nearly every mobile network operator in the world and

---

[7] https://www.m3-brigade.com/sec-filings/content/0001193125-21-249348/d186797ddefa14a.htm
[8] https://www.syniverse.com/products/ipx-network

its solutions help carriers provide their customers with secure global connectivity and messaging. Syniverse's carrier product groups consist of Global Network Services, Outsourced Carrier Solutions, and Messaging Solutions.

36.     According to an investor presentation, Syniverse powers the digital economy for over 8 billion devices:



***Syniverse recognizes the importance of data security and reveals the Data Breach***

37.     On September 27, 2021, in preparation for its merger with M3-Brigade, Syniverse reported to the SEC:

Syniverse has experienced, and may in the future face, hackers, cybercriminals or others gaining unauthorized access to, or otherwise misusing, its systems to misappropriate its proprietary information and technology, interrupt its business, and/or gain unauthorized access to its or its customers' confidential information.

For example, in May 2021, Syniverse became aware of unauthorized access to its operational and information technology systems by an unknown individual or organization (the "May 2021 Incident"). Promptly upon Syniverse's detection of the unauthorized access, Syniverse launched an internal investigation, notified law enforcement, commenced remedial actions and engaged the services of specialized legal counsel and other incident response professionals. Syniverse has conducted a thorough investigation of the incident.

The results of the investigation revealed that the unauthorized access began in May 2016. Syniverse's investigation revealed that the individual or organization gained unauthorized access to databases within its network on several occasions, and that login information allowing access to or from its Electronic Data Transfer ("EDT") environment was compromised for approximately 235 of its customers. All EDT customers have been notified and have had their credentials reset or inactivated, even if their credentials were not impacted by the incident. All customers whose credentials were impacted have been notified of that circumstance.

Syniverse has notified all affected customers of this unauthorized access where contractually required, and Syniverse has concluded that no additional action, including any customer notification, is required at this time.[9]

---

[9] https://www.sec.gov/Archives/edgar/data/1839175/000119312521284329/d234831dprem14a.htm

38.     A former employee who worked on the EDT systems told a reporter that those systems have information on all types of call records and that whoever hacked Syniverse could have had access to metadata such as length and cost, caller and receiver's numbers, the location of the parties in the call, as well as the content of SMS text messages.[10]

39.     The unidentified former employee is quoted as saying: "Syniverse is a common exchange hub for carriers around the world passing billing info back and forth to each other. So it inevitably carries sensitive info like call records, data usage records, text messages, etc. [...] The thing is—I don't know exactly what was being exchanged in that environment. One would have to imagine though it easily could be customer records and [personal identifying information] given that Syniverse exchanges call records and other billing details between carriers."[11]

40.     Karsten Nohl, a security researcher who has studied global cellphone networks for a decade, said: "Syniverse has access to the communication of hundreds of millions, if not billions, of people around the world. A five-year breach of one of Syniverse's main systems is a global privacy disaster. Syniverse systems have direct access to phone call records and text messaging, and indirect access to a

---

[10] https://www.vice.com/en/article/z3xpm8/company-that-routes-billions-of-text-messages-quietly-says-it-was-hacked

[11] *Id.*

large range of Internet accounts protected with SMS 2-factor authentication. Hacking Syniverse will ease access to Google, Microsoft, Facebook, Twitter, Amazon and all kinds of other accounts, all at once."[12]

41.    A telecom industry insider, who asked to remain anonymous as he was not authorized to speak to the press, said: "With all that information, I could build a profile on you. I'll know exactly what you're doing, who you're calling, what's going on. I'll know when you get a voicemail notification. I'll know who left the voicemail. I'll know how long that voicemail was left for. When you make a phone call, I'll know exactly where you made that phone call from. I'll know more about you than your doctor."[13]

42.    "The information flowing through Syniverse's systems is espionage gold," Sen. Ron Wyden said in a statement. "That this breach went undiscovered for five years raises serious questions about Syniverse's cybersecurity practices. The FCC needs to get to the bottom of what happened, determine whether Syniverse's cybersecurity practices were negligent, identify whether Syniverse's competitors have experienced similar breaches, and then set mandatory cybersecurity standards for this industry."[14]

43.    In particular, the reporter asked Syniverse whether the hackers accessed

---

[12] *Id.*
[13] *Id.*
[14] *Id.*

or stole personal data or cellphone users. Syniverse declined to answer that question. Instead, the company sent a statement that echoed what it wrote in the SEC filing.

> As soon as we learned of the unauthorized activity, we implemented our security incident response plan and engaged a top-tier forensics firm to assist with our internal investigation. We also notified and are cooperating with law enforcement. Syniverse has completed a thorough investigation of the incident which revealed that the individual or organization gained unauthorized access to databases within its network on several occasions and that login information allowing access to or from its EDT environment was compromised for certain customers. All EDT customers have had their credentials reset or inactivated, even if their credentials were not impacted by the incident. We have communicated directly with our customers regarding this matter and have concluded that no additional action is required. In addition to resetting customer credentials, we have implemented substantial additional measures to provide increased protection to our systems and customers.[15]

44.     Based on what happened in a previous system glitch, Syniverse preserves data from text messages far beyond the duration it should.

45.     On November 7, 2019, thousands of people received text messages that had been sent months earlier on Valentine's Day but had been frozen in place by a glitched server and were only released nine months later.[16]

---

[15] *Id.*
[16] https://www.theverge.com/2019/11/21/20974692/valentines-day-text-message-delay-explanation-sms-syniverse-carriers

46.     Experts who said that Syniverse's explanation of what happened — that a server went down and was only reconnected nine months later — is plausible, but that the scenario still involves Syniverse royally screwing up. Any server being reconnected should have been "cleaned" first, ensuring that no lingering messages were waiting inside it, according to two people with technical knowledge of how SMS messaging systems work.[17]

47.     SMS messages are also supposed to expire after 15 days, according to one of the people. That means that not only was the server not cleaned, but Syniverse then erred in firing off the messages, since their months-old date should have told the server to destroy them. "There should be multiple verifications all along that should have avoided that," the person said.[18]

***Defendant Acquires, Collects and Stores Plaintiffs' and Class Members' PII.***

48.     Plaintiffs' and Class Members' unencrypted information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII for targeted marketing without the consent of Plaintiffs and Class Members.   Unauthorized individuals can easily access Plaintiffs' and Class Members' PII.

---

[17] *Id.*
[18] *Id.*

49.     Defendant failed to use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiffs and Class Members, causing their PII to be exposed.

50.     As a condition of providing services to its customers, Defendant requires that its customers entrust Defendant with highly confidential PII of their users, including Plaintiffs and Class Members.

51.     At all times relevant to this Complaint, Plaintiffs and Class Members were customers of Defendant's customers who (i) entrusted their highly confidential PII (including whole or partial social security numbers and financial information) to cell phone providers who, in turn, entrusted that material to Defendant and (ii) later learned that their PII was compromised in the Data Breach.

52.     By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

53.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### *Securing PII and Preventing Breaches*

54.     Defendant could have prevented this Data Breach by properly securing, eliminating, and/or encrypting Plaintiffs' and Class Members' PII.

55.     Defendant's negligence in safeguarding Plaintiffs' and Class Members' PII is bewildering given the repeated warnings and alerts about the need to protect and secure sensitive data.

56.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect Plaintiffs' and Class Members' PII.

57.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[19] Under the same statute, the FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[20]

58.     The ramifications of Defendant's failure to keep secure Plaintiffs' and Class Members' PII are long-lasting and severe. Once PII is stolen, fraudulent use

---

[19] 17 C.F.R. § 248.201 (2013).

[20] *Id.*

of that information and damage to victims may continue for years.

### *Value of Personally Identifiable Information (PII)*

59.     The PII of individuals is of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.   For example, one source reports that personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[21] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[22] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[23]

60.     The information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change as text messages may include information like name, Social Security number, and date of birth.

---

[21] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*:   https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed June 9, 2021).

[22] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*:   https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed June 9, 2021).

[23] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed June 9, 2021).

61.     This data demands a much higher price on the black market. According to Martin Walter, senior director at cybersecurity firm RedSeal, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[24]

62.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

63.     Plaintiffs' and Class Members' PII was taken by hackers to engage in identity theft or to sell it to other criminals who will purchase the PII for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

64.     There may be a time lag between when harm occurs versus when it is discovered, and between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use

---

[24] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed June 9, 2021).

> of that information may continue for years. As a result,
> studies that attempt to measure the harm resulting from
> data breaches cannot necessarily rule out all future harm.[25]

65.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding Plaintiffs' and Class Members' PII and of the foreseeable consequences that would occur if their PII was compromised, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result.

66.     Plaintiffs and Class Members now face years of constant monitoring of their financial and personal records and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

67.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its EDT environment.

68.     To date, Defendant has not even notified impacted customers of the Data Breach and refuses to do so.

69.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for Plaintiffs' and Class Members' PII.

---

[25] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/products/gao-07-737 (last accessed June 9, 2021).

## V. CLASS ALLEGATIONS

70.     Plaintiffs bring this nationwide class action on behalf of themselves and

on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and

23(c)(4) of the Federal Rules of Civil Procedure.

71.     The Nationwide Class that Plaintiffs seek to represent is defined as

follows:

> All individuals residing in the United States whose PII was
> accessed during the security incident referenced in the
> Data Breach that Defendant revealed to the SEC on
> September 27, 2021.

72.     The Florida Subclass that Plaintiffs Lerra and Macnish seek to represent

is defined as follows:

> All individuals residing in Florida whose PII was accessed
> during the security incident referenced in Data Breach that
> Defendant revealed to the SEC on September 27, 2021
> (the "Florida Subclass").

73.     The California Subclass that Plaintiffs Baron and Pels seek to represent

is defined as follows:

> All individuals residing in California whose PII was
> accessed during the security incident referenced in Data
> Breach that Defendant revealed to the SEC on September
> 27, 2021 (the "California Subclass").

74.     Excluded from the Classes and Subclasses are the following individuals

and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers

and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

75.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes and Subclasses before the Court determines whether certification is appropriate.

76.     <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1): The Nationwide Class and Subclasses are so numerous that joinder of all members is impracticable. Millions of putative Class Members were likely impacted.

77.     <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Class and Subclasses exist and predominate over any questions affecting only individual Class Members. These include:

     a. Whether and to what extent Defendant had a duty to protect Plaintiffs' and Class Members' PII;

     b. Whether Defendant had a duty not to disclose Plaintiffs' and Class Members' PII to unauthorized third parties;

     c. Whether Defendant had a duty not to use Plaintiffs' and Class Members'

PII for non-business purposes;

d.  Whether Defendant failed to adequately safeguard Plaintiffs' and Class Members' PII;

e.  Whether and when Defendant actually learned of the Data Breach;

f.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

g.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiffs' and Class Members' PII;

i.  Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j.  Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

k.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

78.  <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of

those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendant's misfeasance.

79.    Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

80.    Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

81.    Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims

involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

82.     The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. The costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions

would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

83.     The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

84.     Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

85.     Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure Class Members' PII and may continue to act unlawfully as set forth in this Complaint.

86.     Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

87.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

                    a. Whether Defendant owed a legal duty to Plaintiffs and Class

Members to exercise due care in collecting, storing, using, and safeguarding their PII;

b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Plaintiffs and Class Members are third-party beneficiaries of contracts between Defendant and cellular providers;

e. Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

f. Whether Defendant breached the implied contract;

g. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their PII had been compromised;

h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendant engaged in unfair, unlawful, or deceptive

practices by failing to safeguard the PII of Plaintiffs and Class Members; and,

j.   Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

## COUNT I
### Negligence
**(On Behalf of Plaintiffs and the Nationwide Class)**

88.   Plaintiffs and the Nationwide Class re-allege and incorporate by reference paragraphs 1 to 87 as if fully set forth herein.

89.   As a condition of being customers of cell phone providers, Plaintiffs and the Nationwide Class utilized call and text message services that detailed sensitive information and PII.

90.   Cell phone providers entrusted their customers' PII to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

91.   Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Nationwide Class could and would suffer if the PII were wrongfully disclosed.

92.   Defendant knew or reasonably should have known that the failure to

exercise due care in the collecting, storing, and using Plaintiffs' and the Nationwide Class' PII involved an unreasonable risk of harm to Plaintiffs and the Nationwide Class, even if the harm occurred through the criminal acts of a third party.

93.     Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that Plaintiffs' and the Nationwide Class' PII in Defendant's possession was adequately secured and protected.

94.     Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII it was no longer required to retain pursuant to regulations.

95.     Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiffs' and the Nationwide Class' PII.

96.     Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and the Nationwide Class.   That special relationship arose because Plaintiffs and the Nationwide Class entrusted Defendant with their confidential PII, a necessary part of being customers of Defendant's customers.

97.     Defendant was subject to an "independent duty," untethered to any

contract between Defendant and Plaintiffs or the Nationwide Class.

98.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Nationwide Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

99.    Plaintiffs and the Nationwide Class were the foreseeable and probable victims of any inadequate security practices and procedures.  Defendant knew or should have known of the inherent risks in collecting and storing Plaintiffs' and the Nationwide Class's PII, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

100.    Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and the Nationwide Class. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein.  Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of Plaintiffs' and the Nationwide Class's PII, including basic encryption techniques freely available to Defendant.

101.    Plaintiffs and the Nationwide Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

102.    Defendant was in a position to protect against the harm suffered by Plaintiffs and the Nationwide Class as a result of the Data Breach.

103.    Defendant had a duty to employ proper procedures to prevent the

unauthorized dissemination of Plaintiffs' and the Nationwide Class' PII.

104.   Defendant has admitted that Plaintiffs' and the Nationwide Class' PII was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

105.   Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and the Nationwide Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding Plaintiffs' and the Nationwide Class' PII during the time the PII was within Defendant's possession or control.

106.   Defendant improperly and inadequately safeguarded Plaintiffs' and the Nationwide Class' PII in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

107.   Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect Plaintiffs' and the Nationwide Class' PII in the face of increased risk of theft.

108.   Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and the Nationwide Class by failing to have appropriate procedures in place to detect and prevent dissemination of its customers' customers' PII.

109.   Defendant breached its duty to exercise appropriate clearinghouse

practices by failing to remove its customers' customers' PII it was no longer required to retain pursuant to regulations.

110.   But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Nationwide Class, Plaintiffs' and the Nationwide Class' PII would not have been compromised.

111.   Plaintiffs' injuries were proximately caused by Defendant's failure to implement security measures to protect the Plaintiffs' and the Nationwide Class' PII and the harm, or risk of imminent harm, suffered by Plaintiffs and the Nationwide Class.   Plaintiffs' and the Nationwide Class' PII was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

112.   Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC's periodic publications and orders form part of the basis of Defendant's duty in this regard.

113.   Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and by not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the

foreseeable consequences of the immense damages that would result to Plaintiffs and the Nationwide Class.

114.   Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

115.   Plaintiffs and the Nationwide Class are within the class of persons that the FTC Act were intended to protect.

116.   The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Nationwide Class.

117.   As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class have suffered and will suffer injury, including but not limited to: (i) lost inherent market value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, and significantly (iv) the continued and increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in

Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII. Plaintiffs have also suffered nominal damages.

118.   As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

119.   Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

120.   As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

## COUNT II
### Third-Party Beneficiary of Contracts
### (On Behalf of Plaintiffs and the Nationwide Class)
### (In the Alternative to Counts III and IV)

121.   Plaintiffs and the Nationwide Class, repeat and reallege paragraphs 1 through 87 as if fully restated herein.

122.   Defendant entered into legal contracts with its cellular provider and wireless carrier customers to provide services essential to Plaintiffs and the Nationwide Class regarding the use of their text messaging services. Those contracts cannot be attached to this pleading because they are within the possession of Defendant and are protected by confidentiality and/or a protected trade secret.

123.   Plaintiffs and the Nationwide Class were intended third-party beneficiaries of such contracts.

124.   Defendant breached such contracts through the negligent, careless, reckless, and/or wrongful conduct described herein.

125.   Such breaches, namely, not safely storing and monitoring Plaintiffs and the Nationwide Class' PII, were direct and proximate causes of damages suffered by Plaintiffs and the Nationwide Class

126.   As a direct and proximate result of Defendant's breach of contract, Plaintiffs and the Nationwide Class have suffered and will suffer injury, including but not limited to: These injuries include: (i) lost inherent market value of PII; (ii)

out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, and significantly (iv) the continued and increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII. Plaintiffs have also suffered nominal damages. As a direct and proximate result of Defendant's breach of contract, Plaintiffs and the Nationwide Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

127.   Additionally, as a direct and proximate result of Defendant's breach of contract, Plaintiffs and the Nationwide Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

128.   As a direct and proximate result of Defendant's breach of contract, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and

nominal damages.

## COUNT III
### Breach of Implied Contract
### (On Behalf of Plaintiffs and the Nationwide Class)
### (In the Alternative to Counts II and IV)

129.   Plaintiffs and the Nationwide Class re-allege and incorporate by reference paragraphs 1 to 87 as if fully set forth herein.

130.   Defendant acquired and maintained the PII of Plaintiff and the Nationwide Class.

131. Prior to the Data Breach, Defendant published security-related representations on its website, agreeing to protect and keep private Plaintiffs' and the Nationwide Class' PII.

132.   Plaintiffs and the Nationwide Class would not have entrusted their PII to their cellular providers, and therefore to Defendant, had they known that Defendant's security-related representations on its website were not accurate and that Defendant would not prevent unauthorized access to the PII.

133.   In collecting and maintaining Plaintiffs' and the Nationwide Class' PII and publishing the security-related representations on its website, Defendant entered into contracts with Plaintiffs and the Nationwide Class requiring Defendant to protect and keep private Plaintiffs' and the Nationwide Class' PII.

134.   Plaintiffs and the Nationwide Class fully performed their obligations

under the contracts with Defendant.

135.   Defendant breached the contracts it made with Plaintiff and the Nationwide Class by failing to protect and keep private Plaintiffs' and the Nationwide Class' PII, including failing to (i) encrypt or tokenize the sensitive PII of Plaintiff and the Nationwide Class, (ii) delete such PII that it no longer had reason to maintain, (iii) eliminate the potential accessibility of the PII from the Internet, and (iv) otherwise review and improve the security of its computer system that contained such PII.

136.   As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and the Nationwide Class have suffered (and will continue to suffer) injuries. These injuries include: (i) lost inherent market value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, and significantly (iv) the continued and increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII. Plaintiffs have also suffered nominal damages.

137.  As a direct and proximate result of Defendant's breach of contract, Plaintiffs are at an increased risk of identity theft or fraud.

138.  As a direct and proximate result of Defendant's breach of contract, Plaintiffs are entitled to and demand actual, consequential, and nominal damages and injunctive relief.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class)**
**(In the Alternative to Counts II and III)**

139.  Plaintiffs and the Nationwide Class re-allege and incorporate by reference paragraphs 1 to 87 as if fully set forth herein.

140.  Plaintiffs and the Nationwide Class conferred a monetary benefit on Defendant in the form of monies or fees paid for services from Defendant. Defendant had knowledge of this benefit when it accepted the money from Plaintiffs and the Nationwide Class.

141.  The monies or fees paid by Plaintiffs and the Nationwide Class were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiffs and the Nationwide Class.

142.  Defendant failed to provide reasonable security, safeguards, and protections to the personal data of Plaintiffs and the Nationwide Class, which

resulted in Plaintiffs and the Nationwide Class overpaying Defendant's customers for the services they purchased.

143.   Defendant failed to disclose to Plaintiffs and the Nationwide Class that its safeguards and security measures were inadequate to safeguard Plaintiffs 'and the Nationwide Class' PII against theft.

144.   Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and the Nationwide Class because Defendant failed to provide adequate safeguards and security measures to protect Plaintiffs' and the Nationwide Class's PII, who paid for such measures but did not receive them.

145.   Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiffs and the Nationwide Class.

146.   Defendant's enrichment at the expense of Plaintiffs and the Nationwide Class is and was unjust.

147.   As a result of Defendant's wrongful conduct, as alleged above, Plaintiffs and the Nationwide Class are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

## COUNT V
### Violation of the Florida Deceptive and Unfair Trade Practices Act,
### (Fla. Stat. §§ 501.201, *et seq.*)

41

**(On Behalf of Plaintiffs Lerra and Macnish and the Florida Subclass)**

148.   Plaintiffs Lerra and Macnish and the Florida Subclass re-allege and incorporate by reference paragraphs 1 to 87 as if fully set forth herein.

149.   Defendant engaged in the conduct alleged in this Complaint through transactions in and involving trade and commerce.  Mainly, Defendant obtained the PII of Plaintiffs Lerra and Macnish and the Florida Subclass through advertising, soliciting, providing, offering, and/or distributing goods and services to Plaintiffs Lerra and Macnish and the Florida Subclass and the Data Breach occurred through the use of the internet, an instrumentality of interstate commerce.

150.   As alleged herein this Complaint, Defendant engaged in unfair or deceptive acts or practices in the conduct of consumer transactions, including, among other things, the following:

      a.   failure to implement adequate data security practices to safeguard the PII of Plaintiffs Lerra and Macnish and the Florida Subclass;

      b.   failure to make only authorized disclosures of the PII of Plaintiffs Lerra and Macnish and the Florida Subclass; and

      c.   failure to disclose that its computer systems and data security practices were inadequate to safeguard the PII of Plaintiffs Lerra and Macnish and the Florida Subclass from theft; and

        d.  failure to timely notify Plaintiffs Lerra and Macnish and the Florida

            Subclass of the Data Breach, as required by Fla. Stat. § 501.171(4)

151.   Defendant's actions constitute unconscionable, deceptive, or unfair acts or practices because, as alleged herein, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are and were substantially injurious to its current and former customers.

152.  In committing the acts alleged above, Defendant engaged in unconscionable, deceptive, and unfair acts and practices acts by omitting, failing to disclose, or inadequately disclosing to its current and former customers that it did not follow industry best practices for the collection, use, and storage of the PII of Plaintiffs Lerra and Macnish and the Florida Subclass.

153.  As a direct and proximate result of Defendant's conduct, Plaintiffs Lerra and Macnish and the Florida Subclass have been harmed and have suffered damages including, but not limited to: (i) lost inherent market value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, and significantly (iv) the continued and increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in

Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII. Plaintiffs have also suffered nominal damages.

154.   As a direct and proximate result of the unconscionable, unfair, and deceptive acts or practices alleged herein, Plaintiffs Lerra and Macnish and the Florida Subclass have been damaged and are entitled to an order providing declaratory and injunctive relief and reasonable attorneys' fees and costs, to the extent permitted by law.

155.   Also as a direct result of Defendant's knowing violation of the Florida Unfair and Deceptive Trade Practices Act, Plaintiffs Lerra and Macnish and the Florida Subclass are entitled to injunctive relief, including, but not limited to:

a.   Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b.   Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

44

c.      Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

d.      Ordering that Defendant segment PII by, among other things, creating firewalls and access controls so that if one area of Defendant is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.      Ordering that Defendant purge, delete, and destroy in a reasonably secure manner PII not necessary for its provisions of services;

f.      Ordering that Defendant conduct regular database scanning and securing checks;

g.      Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

h.      Ordering Defendant to meaningfully educate its current and former customers about the threats they face as a result of the loss of their PII to third parties, as well as the steps Defendant's current and former customers must take to protect themselves; and

i.      requiring Defendant to thoroughly and regularly evaluate any

vendor's or third-party's technology that allows or could allow access

to PII and to promptly migrate to superior or more secure alternatives.

**COUNT VI**
**Violation of the California Consumer Privacy Act, Cal. Civ. Code §§**
**1798.100, *et seq*.**
**(On Behalf of Plaintiffs Baron and Pels and the California Subclass)**

156.   Plaintiffs Baron and Pels and the California Subclass re-allege and incorporate by reference paragraphs 1 to 87 as if fully set forth herein.

157.   Plaintiffs Baron and Pels and California Subclass members are residents of California.

158.   Syniverse is a corporation that is organized or operated for the profit or financial benefit of its shareholders or other owners, with a public offering valuation of approximately $2.85 billion.

159.   Syniverse is a business that collects consumers' personal information as defined by Cal. Civ. Code § 1798.140(e). Specifically, Syniverse obtains, receives, or accesses consumers' personal information when customers send text messages through infrastructure maintained by Syniverse.

160.   Syniverse and its direct customers determine the purposes and means of processing consumers' personal information. Syniverse uses consumers' personal data to provide services at customers' requests, as well as to develop, improve, and

test Syniverse services.

161.   Syniverse is registered as a "data broker" in California, which is defined as a "business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct relationship." Cal. Civ. Code § 1798.99.80.

162.   Syniverse violated Section 1798.150 of the California Consumer Privacy Act by failing to prevent Plaintiffs Baron and Pels and the California Subclass members' nonencrypted and nonredacted personal information from unauthorized access and exfiltration, theft, or disclosure as a result of Syniverse's violation of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

163.   Syniverse knew or should have known that its data security practices were inadequate to secure California Subclass members' PII and that its inadequate data security practices gave rise to the risk of a data breach.

164.   Syniverse failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the PII it collected and stored.

165.   The cybercriminals accessed "nonencrypted and unredacted personal information" as covered by Cal. Civ. Code § 1798.81.5(A)(1)(d), in the Data Breach.

166.   Upon information and belief, Plaintiffs Baron and Pels' and California Subclass members' PII accessed by the cybercriminals in the Data Breach includes

"nonencrypted and unredacted personal information" as covered by Cal. Civ. Code § 1798.81.5(A)(1)(d).

167.   Plaintiffs Baron and Pels and California Subclass members seek injunctive relief in the form of an order requiring Syniverse to employ adequate security practices consistent with law and industry standards to protect the California Subclass members' PII, requiring Syniverse to complete its investigation, and to issue an amended statement giving a detailed explanation that confirms, with reasonable certainty, what categories of data were stolen and accessed without the California Subclass members' authorization, along with an explanation of how the data breach occurred.

168.   As a direct and proximate result of Syniverse's violations of the Cal. Civ. Code §§ 1798.150, Plaintiffs Baron and Pels and California Subclass members suffered damages, as described above.

169.   On December 3, 2021, counsel for Plaintiffs Baron and Pels served written notice identifying Syniverse's violations of Cal. Civil Code § 1798.150(a) and demanding the data breach be cured, pursuant to Cal. Civil Code § 1798.150(b).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court enter an Order:

A.   certifying the Nationwide Class, the Florida Subclass, and the

California Subclass and appointing Plaintiffs and their Counsel to represent each such Class and Subclass;

B.    enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII;

C.    providing injunctive or other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

   i.  prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

   ii. requiring Defendant to protect, including through encryption and other means, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

   iii.    requiring Defendant to delete, destroy, and purge Plaintiffs' and Class Members' personal identifying information of unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

   iv.    requiring Defendant to implement and maintain a comprehensive

Information    Security    Program    designed    to    protect    the
confidentiality and integrity of Plaintiffs 'and Class Members' PII;

v. prohibiting  Defendant  from  maintaining  Plaintiffs'  and  Class
Members ' PII on a cloud-based database;

vi.    requiring Defendant to engage independent third-party security
auditors/penetration testers as well as internal security personnel to
conduct testing, including simulated attacks, penetration tests, and
audits on Defendant's systems on a periodic basis, and ordering
Defendant to promptly correct any problems or issues detected by
such third-party security auditors;

vii.   requiring Defendant to engage independent third-party security
auditors  and  internal  personnel  to  run  automated  security
monitoring;

viii.  requiring Defendant to audit, test, and train its security personnel
regarding any new or modified procedures;

ix.    requiring Defendant to segment data by, among other things,
creating  firewalls  and  access  controls  so  that  if  one  area  of
Defendant's network is compromised, hackers cannot gain access to
other portions of Defendant's systems;

x. requiring  Defendant  to  conduct  regular  database  scanning  and

50

securing checks;

xi.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to

appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.   requiring Defendant to meaningfully educate Plaintiffs and Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment; and

xvii.   requiring Defendant to thoroughly and regularly evaluate any vendor's or third-party's technology that allows or could allow access to PII and to promptly migrate to superior or more secure alternatives;

D.     For an award of damages, including actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E.     For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.     For prejudgment and post-judgment interest on all amounts awarded; and,

G.     Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand that this matter be tried before a jury.

Date: December 3, 2021                    Respectfully Submitted,

                                          */s/ John A. Yanchunis*_____

                                          John A. Yanchunis
                                          Ryan D. Maxey
                                          **MORGAN & MORGAN COMPLEX
                                          LITIGATION GROUP**
                                          201 N. Franklin Street, 7th Floor
                                          Tampa, Florida 33602
                                          (813) 223-5505
                                          jyanchunis@ForThePeople.com
                                          **rmaxey@ForThePeople.com**

                                          James J. Pizzirusso*
                                          **HAUSFELD LLP**
                                          888 16th Street, N.W.
                                          Suite 300
                                          Washington, DC 20006
                                          (202) 540-7200

jpizzirusso@hausfeld.com

Steven M. Nathan*
**HAUSFELD LLP**
33 Whitehall Street
14th Floor
New York, New York 10004
(646) 357-1100
snathan@hausfeld.com


Linda P. Nussbaum*
Susan R. Schwaiger
**NUSSBAUM LAW GROUP, P.C.**
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
(917) 438-9189
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com


Amy E. Keller*
James A. Ulwick*
**DICELLO LEVITT GUTZLER**
Ten North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
(312) 214-7900
akeller@dicellolevitt.com
julwick@dicellolevitt.com

Michael E. Criden
Kevin B. Love
Lindsey C. Grossman
**CRIDEN & LOVE, P.A.**
7301 SW 57th Court, Suite 515
South Miami, FL 33143
(305) 357-9000
mcriden@cridenlove.com

klove@cridenlove.com
lgrossman@cridenlove.com


Marc R. Weintraub (Florida Bar No.
119976)
**BAILEY GLASSER LLP**
360 Central Avenue, Suite 1450
St. Petersburg, Florida 33701
T: 727.894.6745
F: 727.894.2649
mweintraub@baileyglasser.com

Michael L. Murphy*
Lawrence J. Lederer*
**BAILEY GLASSER LLP**
1055 Thomas Jefferson Street NW, Suite
540
Washington, DC 20007
T: 202.463.2101
F: 202.463-2103
mmurphy@baileyglasser.com
llederer@baileyglasser.com


*Pro Hac Vice to be submitted

## __CERTIFICATE OF SERVICE__

I hereby certify that on December 3, 2021, the foregoing document was filed with the Clerk by using the CM/ECF system, which will send notification to all attorneys of record in this matter.

/s/ *John A. Yanchunis*

John A. Yanchunis